UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CITY OF PONTIAC,

                    Plaintiff,                          Case Number 24-10287
v.                                                      Honorable David M. Lawson

BOARD OF TRUSTEES OF THE CITY OF
PONTIAC VEBA TRUST,

                    Defendant.
_____/

## OPINION AND ORDER DENYING MOTION
## FOR PRELIMINARY INJUNCTION

On February 5, 2024, the plaintiff filed its complaint in this case seeking injunctive and declaratory relief based on alleged violations of a trust agreement that governs the City's reorganized retiree benefit plans.  The trust agreement was created as part of a settlement concerning the payment of retiree medical benefits, which is reflected in a consent judgment entered in *Pontiac Retirees v. City of Pontiac*, No. 12-12830 (E.D. Mich.).  This matter is before the Court on plaintiff City of Pontiac's motion for a preliminary injunction to enjoin the defendant Board of Trustees from implementing a change that would expand the benefits afforded to retirees. The City alleges that the Trustees of the New VEBA Trust, which was established to relieve the City of its obligation to provide lifetime retiree healthcare benefits, breached contract obligations and fiduciary duties by adopting changes to retiree healthcare benefit plans that, according to the City, "put the VEBA in jeopardy of ultimately becoming underfunded, . . . likely leading to a situation in which there are insufficient funds to provide benefits to the eligible retirees who are the beneficiaries of the VEBA."  The City seeks declaratory and injunctive relief restraining the VEBA Trustees from implementing the health care plan changes, which were adopted by the Trustees in September 2023, and scheduled to take effect on March 1, 2024.

The Court heard oral argument in the motion on February 22, 2024, during which the Court questioned its subject matter jurisdiction and ordered supplemental briefs on that issue. After reviewing those briefs, the Court believes that it may address the City's complaint and motion under its ancillary jurisdiction, because the case is related to the settlement agreement and consent judgment entered in the *Pontiac Retirees* case. Preliminary injunctive relief is not appropriate, however, because the City has not demonstrated a likelihood of immediate or irreparable harm, and it has not shown that it likely will succeed on the merits of its pleaded claims. The motion for a preliminary injunction, therefore, will be denied.

## I.

The present litigation is the most recent chapter in the long running dispute between the City of Pontiac and its retirees over the satisfaction of obligations that the City assumed to provide retiree healthcare benefits. The historical facts were summarized by the Court in its recent opinion denying a motion by the City of Pontiac Retired Employees Association (CPREA) in the *Pontiac Retirees* case, which sought certain modifications to the consent judgment that supplies the governing legal framework for the current iteration of the City's retiree healthcare benefit plans. That case originally was brought by CPREA and others under 42 U.S.C. § 1983 to enforce their constitutional rights under the Due Process Clause. Summing up the history to that point:

> The consent judgment entered by Judge [Avern] Cohn on November 19, 2018, *see* ECF No. 95, *City of Pontiac Retired Emps. Ass'n v. Schimmel*, No. 12-12830 (E.D. Mich.), resolved a dispute between the City of Pontiac and its former employees over the continuation of retiree health benefits. A key provision of that consent judgment was the establishment of a new trust to provide health benefits for the City's retirees.

> Six years earlier, in 2012, the City of Pontiac Retired Employees Association, along with several of its members, sued the City and then Emergency Manager (EM) Louis Schimmel. The plaintiffs proceeded on behalf of themselves and around 1,500 municipal retirees in a challenge to the EM's order substituting a temporary monthly fixed benefit premium assistance payment in lieu of the City's previous guarantee of lifetime retiree health coverage, which was to be reduced and

- 2 -

eventually eliminated.  Judge Lawrence Zatkoff denied a motion for preliminary injunction, but that ruling was reversed on appeal.  Judge Cohn inherited the case on remand, and he subsequently presided over several years of intense negotiations between the parties.

In March 2017, with the aid of a mediator, the parties finally hammered out an agreement by which the City would be relieved of any perpetual obligation to provide healthcare benefits, in exchange for its commitment to establish and fund a new retiree benefit trust fund, with the seed money for the new fund to be provided largely by liquidation of the former retiree benefit plan.  The City was obligated to make an initial payment of $4,250,000, with further annual payments to follow if further funding was determined to be necessary by an ongoing actuarial assessment.  Judge Cohn certified a settlement class consisting of most of the City's retirees, but excluding former employees of Pontiac General Hospital, whose employee association had attempted to intervene in the case.  He later granted a motion to approve a proposed consent judgment after rejecting the objections of a handful of class members and a challenge to the propriety of the settlement by the hospital retirees.  The approved consent judgment was entered by the Court on November 19, 2018.

While this case was pending, a separate suit was filed in state court by the City's retired police officers and firefighters, who made up a subset of the class of retirees in this case.  The consent judgment acknowledged the existence of that suit, and it provided that any payments made to settle the claims in that case would be credited against the City's funding obligations assumed under the settlement in this case.  The state lawsuit eventually was resolved by a similar agreement, and, in July 2019, judgment entered in the state court awarding $4,073,000 to the police and fire retiree benefit fund.  The parties here concur that the judgment recovery in the separate litigation properly was deemed to satisfy the lion's share of the City's initial $4.25 million funding obligation under the terms of the consent judgment in this case.

The parties subsequently brought before the Court a dispute over the deadline for the City's remittance of the remaining approximately $176,000 in initial funding that was called for by the consent judgment.  On April 6, 2021, the Court granted the plaintiffs' motion to enforce the consent judgment and ordered the City "forthwith [to] tender the remainder of the funds due the New VEBA [Voluntary Employee Beneficiary Association] trust."

The terms of the consent judgment were spelled out in the parties' settlement agreement, which was made part of the record in this case and incorporated by reference into the consent judgment.  The parties to the settlement agreement were identified as the City of Pontiac Retired Employees Association; the individuals named as plaintiffs and class representatives in this case, acting on behalf of themselves and absent members of the settlement class; the City of Pontiac; and its officials who were named as defendants.  The agreement provided that the historical Pontiac General Employees Retirement System Pension Plan ("GERS") would be

terminated, and a new plan would be created and funded with assets equal to 130% of the liabilities of the old plan. Any assets from the GERS liquidation in excess of 130% of plan liabilities were to be rolled over into a Voluntary Employee Beneficiary Association Plan (the "New VEBA Plan"), governed by Section 501(c)(9) of the Internal Revenue Code. That New VEBA Plan then would provide for ongoing retiree health benefits, and the City would be absolved of any perpetual obligation to supply the same. The City agreed that it would seek an IRS determination that the New VEBA Plan was appropriately constituted for tax-exempt status, and, upon receiving IRS approval, that it would pay initial funding into the plan trust fund. The parties also acknowledged the police and firefighters' litigation and provided for the offset of any settlement funds paid by the City in that case. Finally, the agreement stated that it would be governed by federal law and Michigan state law, as applicable, and that it "may not be modified except in writing signed by or on behalf of all parties and, as necessary, with Court approval."

On March 23, 2020, the City of Pontiac and the appointed trustees of the New VEBA Plan executed a Trust Agreement establishing the new benefit plan's trust fund. As noted earlier, assets of the Old GERS Plan in excess of 130% of its future liabilities were to be transferred into the New VEBA Plan to fund ongoing health benefit premiums. Assets equal to 130% of the Old GERS Plan liabilities were to be rolled over to a New GERS Plan (referred to here by the parties as "REGERS"). *See* Settlement Agrmt. ¶ 6, ECF No. 78-2, PageID.1426 ("The City of Pontiac will terminate the General Employees Retirement System Pension Plan ('GERS Plan') and establish a new GERS Plan, which will receive assets equal to 130% of the pension liabilities of the old GERS Plan.").

It is undisputed that the preliminary funding of the New VEBA and REGERS plans was accomplished as mandated, after the Court resolved the dispute over the funding deadline for the New VEBA Plan. The Settlement Agreement specified that the funds allocated to the New VEBA Plan would be used to provide City retirees with health benefit coverage meeting certain requirements for medical, dental, vision, and life insurance. *See* Settlement Agrmt, ¶¶ 9-11, PageID.1429-30. The agreement further provided that an interim monthly stipend which the City had been paying to retirees to cover their healthcare premiums would be continued "until, but not beyond, such time as the U.S. Internal Revenue Service has approved the new Plans identified in this agreement, and they have begun operation and are providing the benefits identified in this Agreement." *Id.* ¶ 13, PageID.1430. It is undisputed that the $400 per month stipend was provided to retirees through January 2022, but the stipend was discontinued in February 2022 after the transition of the benefit plans was completed and the New VEBA Plan fully assumed and began to perform its benefit obligations.

*City of Pontiac Retired Emps. Ass'n v. Schimmel*, No. 12-12830, 2023 WL 4964364, at *1-3 (E.D. Mich. Aug. 3, 2023). The Court's opinion addressed a motion by CPREA that sought a modification of the consent judgment specifying that the $400-per-month stipend would be

continued permanently.  The Court denied the motion after finding that the plaintiffs had failed to demonstrate that any changed circumstances would render conformance with the negotiated terms of the consent judgment inequitable.

The City and the New VEBA Trustees now are before the Court with a new dispute over whether the Trustees have the authority to make changes to the schedule of benefits afforded to retirees, and to incur corresponding premium increases, where an actuarial evaluation of the New VEBA Plan Trust shows that the Trust is significantly overfunded against its potential future liabilities and will remain overfunded despite changes that the Trustees have approved.  At issue in this case are the relevant terms of contextually interlocking passages of the Settlement Agreement, which was incorporated wholly into the consent decree issued by this Court when it approved the compromise of the class action suit, and a Trust Agreement that the City executed when it bequeathed assets to the benefit plan trust that the Settlement Agreement required the City to fund.  The operative language of the Settlement Agreement states as follows:

> Level of Coverage for Retiree Health Care.  The New VEBA Plan shall provide eligible pre-65 retirees with the Blue Cross/Blue Shield Simply Blue 500 plan, or an equivalent plan with equivalent coverage levels at equivalent cost. It contains 20% co-insurance with $500 deductible for individual/$1,000 deductible for family for in-network services for pre-65 age retirees, with a co-insurance maximum of $2,500.  The post-65 age retirees will receive a Plan which is supplemental to Medicare and/or Medicare Advantage Plan with a $500 deductible, without any coinsurance, with a $500 limit on out of pocket costs.  Both the pre- and post-65 age retirees will receive prescription drug coverage with a $10 co-pay for generic, $40 for preferred brand names, and $80 for all other brand name drugs. No retiree shall be responsible for paying any part of the premium for these plans, unless modified by the Trustees as set forth below.  *Under the New VEBA Plan, the Trustees will have the flexibility to review comparable coverage and make decisions on better, comparable, equivalent and lower cost coverages. . . . If and when the New VEBA Plan has insufficient funds to provide the level of benefits and coverage specified above in a given fiscal year, the Board of the New VEBA Plan shall have the discretion to make reasonable plan design changes, and change benefit and coverage levels.*  Notwithstanding the foregoing, the City of Pontiac's annual contribution is limited to a maximum of $1.5 million, and shall not exceed that amount under any circumstances, as set forth in Paragraph 8.

Settlement Agreement ¶ 9, *Pontiac Retirees*, No. 12-12830, ECF No. 78-2, PageID.1429 (emphasis added).  As alluded to in the above paragraph, a central tenet of the compromise was the stop-loss provision providing that, after the plan trust was established and funded initially, the City could not be called upon to contribute more than $1.5 million in any fiscal year to make up any shortfall in funding, and then only if the VEBA's actuaries had determined that the plan's funding ratio had fallen below 100% of its lifetime premium obligations:

> [I]n any fiscal year in which actuaries hired by the Trustees of the New VEBA Plan determine that a required contribution exists to the New VEBA Plan for unfunded liability of the New VEBA Plan (e.g., if an actuary determines that there are not enough funds in the system as a whole to last through the life of the last beneficiary), the City will make a contribution to the New VEBA Plan on or before June 30th of the fiscal year in the amount of the lesser of the actuarial required contribution to satisfy the unfunded liability, or $1,500,000. . . . *Under no circumstances shall the City's contribution to the New VEBA Plan exceed $1,500,000 in any fiscal year* (e.g., if an actuary determines that the actuarial required contribution to restore the fund to 100% funding through the life of the last beneficiary is $5 million, the City shall only be required to pay $1.5 million).

Settlement Agreement ¶ 8, PageID.1428 (emphasis added).  At oral argument, in response to inquiry by the Court, the Trustee's and City's counsel agreed that the beneficiaries of the pool consist of a known and fixed number of presently retired and fully vested future retirees, and that the population of retirees entitled to lifetime benefits from the Trust only will decline over time until, inevitably, none remain.  Counsel represented that upon the death of the last eligible beneficiary, any remaining funds in the Trust would revert to the City.  Counsel represented that the Trust was funded initially with funds in excess of $40 million, which were intended to cover fully all of the Trust's anticipated future premium obligations.

To fulfill its obligations under the Settlement Agreement, the City executed a Trust Agreement which established the New VEBA Trust.  Among other things, the Trust Agreement sets forth the purpose of the Trust  The City bases its claim that the VEBA Trustees are barred from unilaterally enhancing benefits to the retirees on the following provision:

*The purpose of this Trust Agreement and the Trust is to provide*, through insurance contracts, contracts with health maintenance organizations, preferred provider organizations, other similar health care provider organizations, or otherwise *for medical benefits for Retirees and their spouses and dependents*, **pursuant to the terms of the Plan**, **and** *for such life, sickness, accident or other benefits as defined in Code section 501(c)(9) for Retirees and their spouses and dependents, as the City and the Trustees shall from time to time agree shall be funded through this Trust or as may be required to be funded through this Trust pursuant to the terms of the Settlement Agreement.* Together with the Plan and any other benefit plan funded through this Trust, this Trust shall constitute a VEBA Trust and shall be administered and interpreted so as to comply with the requirements of Code section 501(c)(9). *This Trust is created for the exclusive purpose of providing for the funding of and payment of Retiree Health Benefits through any lawful means in accordance with the Plan and the Settlement Agreement* for the exclusive benefit of Participants and beneficiaries.

Trust Agreement ¶ 2.2, ECF No. 5-1, PageID.345 (emphasis added). The term "Plan" or "The Plan" according to the Trust Agreement "means the City of Pontiac Retiree Group Health and Insurance Plan." *Id.* ¶ 1.18, PageID.344.

In other sections defining the Powers and Duties of the VEBA Trustees, the Trust Agreement states:

*The Trustees shall have the entire care and custody of all assets of the Trust*, except that the Trustees shall appoint a professional management company experienced in managing public and private sector VEBA Trusts to act as the Trust Fund's investment manager, as described in Section 5.6. The Trustees shall hold all the powers of Trustees that are necessary to carry out the purposes of this Trust that are generally available to Trustees under the laws of the State of Michigan, except as limited by this Trust and by federal law. . . . The Trustees are also authorized to take all necessary action to maintain the Plan in compliance with applicable federal and state law. *Except as expressly otherwise provide herein, the Trustees shall have exclusive authority and discretion to manage and control the assets of the Plan held in the Trust Fund*, and shall be the investment fiduciary for the Trust Fund as required by Act 149, provided that the Trustees may delegate such authority and discretion to an investment manager as described in Section 5.6.

. . .

*The Trustees shall carry out the purposes of this Trust Agreement, and may maintain any Retiree Health Benefits now in force and effect and available to Participants or may substitute other comparable or more comprehensive policies in lieu thereof.* In providing Retiree Health Benefits to the Participants of the Plan so as to effectuate the purposes of this Trust Agreement, the Trustees shall be bound

- 7 -

by the terms of this Trust Agreement and the Settlement Agreement and shall comply with all applicable laws.  The Trustees may make application to insurance companies, duly authorized to conduct the business of insurance in the State of Michigan for the issuance of insurance policies providing for life, sick, accident or other benefits as defined in Code section 501(c)(9).  In addition to, or in lieu of, policies of insurance obtained through commercial or other companies, the Trustees may, consistent with applicable federal and Michigan laws, adopt a self-insured plan.  The Trustees may arrange for a continuation of the present arrangements regarding the provision of benefit coverage by the employer through the employer's self-insured arrangement and all existing policies between the City and applicable insurance carriers.

Trust Agreement ¶¶ 5.1, 5.2(a), PageID.351-52 (emphasis added).

The present dispute arises from actions of the Trustees that occurred when they convened in August 2023 to review and consider potential changes to the retiree healthcare benefit plan.  The Trust's insurance provider presented a proposal for a status quo renewal of the benefits then in effect, along with a proposal for a renewal with up to five specific benefit enhancements, which would be accompanied by increased premiums.  The Trustees sought an actuarial evaluation of the proposed benefit enhancements, and it was determined that, if all five of the proposed enhancements were adopted and funded for the lifetime of the trust, the result would be a decrease of the Trust's overfunded status from 153% to 122% of its lifetime premium obligations.  On September 15, 2023, the Trustees met again and approved only one of the five enhancements that the plan provider had proposed, which was a reduction in deductibles payable by retirees, at an annual cost increase of $387,111.  Based on the actuarial report, the adoption of that single enhancement, if implemented for the lifetime of the trust, would cause the overfunding ratio to decrease from 153% to 148%.  However, the Trustees did not authorize that single plan change in perpetuity, but instead only approved the enhanced benefits and increased premiums to take effect on March 1, 2024 and continue through December 31, 2025.

On November 3, 2023, the City filed a complaint in the Oakland County, Michigan circuit court seeking to enjoin the VEBA Trustees from implementing the plan change that they had

adopted in September 2023.  The City accused the VEBA Trustees of violating their contractual and fiduciary duties by adopting plan change without the City's consent, which the City says is mandated by Paragraph 2.2 of the Trust Agreement.  Along with the complaint, the City also filed a motion for preliminary injunction.  A hearing was held before Judge Martha Anderson on November 29, 2023.  During the hearing, Judge Anderson heard presentations by counsel that substantially covered all of the facts discussed above.  At the end of the hearing, she ruled as follows:

> It appears to this Court that there is some disconnect and I appreciate the argument [by the City] that the settlement agreement language does not necessarily prohibit the trust language . . . to require the city to have input.  However, the settlement agreement is [the document] that controls in this matter.  And as much as all of us would like to have a crystal ball about how the economic situation is going to be in the future, we don't have that ability and we have to rely on experts to sort through those things and hypothecate [*sic*] about what it'll be.  Having said that, I do not find that there is irreparable harm at this point in time.  However, I am going to require that, within the next 30 days, that the city and the VEBA board engage in mediation [] with an individual of your choosing.

Hr'g. Tr., ECF No. 10-11, PageID.957.  Rather than proceeding per Judge Anderson's direction to engage in mediation, the parties instead stipulated to dismiss the state court suit on December 6, 2023, with the understanding that it would be refiled in this Court.

The City, despite the professed urgency of its demand for injunctive relief, waited until two months later, on February 5, 2024, to refile the case here.  In its complaint, the City pleads claims for breach of contract (alleging conduct by the Trustees in violation of the terms of the Trust Agreement), and breach of fiduciary duty.  The case promptly was reassigned to this Court as a companion matter to the *Pontiac Retirees* litigation.  The City also filed an "emergency motion" for a temporary restraining order and preliminary injunction.  The motion for a TRO was denied without prejudice, and the Court scheduled a hearing to address the request for preliminary injunction.

II..  Subject Matter Jurisdiction

The Court initially questioned whether it has subject matter jurisdiction to entertain the City's complaint.  The lawsuit seeks an interpretation of the VEBA Trust Agreement and contends that the defendant Board of Trustees has violated it.  No one contends that the complaint arises under federal law, and it is clear that the parties are not diverse.  In its complaint, the City cites as the basis of its jurisdiction a provision in the Settlement Agreement stating that this Court "will retain exclusive jurisdiction to resolve any disputes relating to or arising out of this Agreement or the enforcement, interpretation, or implementation of the terms of this Agreement."  Compl. at 2, ECF No. 1, PageID.2.  But it is well established that parties to a lawsuit cannot by agreement confer subject matter jurisdiction upon a federal court.  *People's Bank v. Calhoun*, 102 U.S. 256, 260-61 (1880) ("It needs no citation of authorities to show that the mere consent of parties cannot confer upon a court of the United States the jurisdiction to hear and decide a case."); *see also Am. Fire & Cas. Co. v. Finn*, 341 U.S. 6, 17-18 (1951) (declaring that "[t]he jurisdiction of the federal courts is carefully guarded against expansion by . . . consent of the parties. . . . [Otherwise,] an act of the parties [would] work a wrongful extension of federal jurisdiction and give district courts power the Congress has denied them").

The City now argues that the Court has inherent jurisdiction to enforce its judgments, which undoubtedly is true.  *Riggs v. Johnson Cnty.*, 73 U.S. 166, 187 (1867) ("Jurisdiction is defined to be the power to hear and determine the subject-matter in controversy in the suit before the court, and the rule is universal, that if the power is conferred to render the judgment or enter the decree, it also includes the power to issue proper process to enforce such judgment or decree.").  That simple statement does not answer the question, however, since this lawsuit alleges a breach of the VEBA Trust Agreement, not the consent judgment entered in the related case; the defendant

VEBA Board of Trustees was not a party to the related case; and the City contends (or at least did in the state court case) that the VEBA Trust Agreement is entirely separate from the consent judgment.

It is the City's current position, as stated in its supplemental brief, that the present suit is intended to enforce its rights under the consent judgment, and that this Court has ancillary jurisdiction to do so. Two cases lead the Court in that direction. One is *Kokkonen v. Guardian Life Insurance Company of America*, 511 U.S. 375 (1994), in which the Supreme Court held that a federal court does not have the authority to enforce a settlement agreement in a federal action that was dismissed by stipulation under Federal Rule of Civil Procedure 41(a)(1), unless there is an independent basis for subject matter jurisdiction. Ancillary jurisdiction did not extend that far. *Id.* at 380. The Court suggested, though, that "[t]he situation would be quite different if the parties' obligation to comply with the terms of the settlement agreement had been made part of the order of dismissal — either by separate provision (such as a provision 'retaining jurisdiction' over the settlement agreement) or by incorporating the terms of the settlement agreement in the order." *Id.* at 381. No such provision is found on the face of the consent judgment in the *Pontiac Retirees* case. But that judgment incorporates the terms of the settlement agreement, which does contain language to that effect, quoted earlier.

The second case is *Peacock v. Thomas,* 516 U.S. 349 (1996), in which the Court discussed the instances when ancillary jurisdiction may be exercised over a dispute that a federal court otherwise would not have the authority to adjudicate. Those instances are when necessary "'(1) to permit disposition by a single court of claims that are, in varying respects and degrees, factually interdependent; and (2) to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees.'" *Id.* at 354 (quoting *Kokkonen*,

511 U.S. at 379-80 (citations omitted).  The first category now is understood to be the supplemental jurisdiction authorized by 28 U.S.C. § 1367.  "The second category of ancillary jurisdiction is generally referred to as 'ancillary enforcement jurisdiction.'" *Hudson v. Coleman*, 347 F.3d 138, 142 (6th Cir. 2003).  "In defining that power, [the Supreme Court] ha[s] approved the exercise of ancillary jurisdiction over a broad range of supplementary proceedings involving third parties to assist in the protection and enforcement of federal judgments." *Peacock,* 516 U.S. at 356.

It is the City's position that defendant VEBA Board of Trustees' action approving the benefit enhancement is in derogation of its rights under the settlement agreement.  It maintains that ancillary jurisdiction exists to enforce the consent judgment even against a third party whose activities are enabled (and, in fact, created) by the consent judgment itself.  The Court agrees.  The case is similar to *202 N. Monroe, LLC v. Sower*, 850 F.3d 265, 270 (6th Cir. 2017), where a group of homeowners sued a city and a land developer to enjoin the enforcement of a consent judgment entered in an earlier federal case that effectuated a change in zoning regulations.  The homeowners were not parties to the earlier lawsuit.  Although the court of appeals agreed that the anti-injunction statute barred the latter suit, it also concluded that the district court had ancillary jurisdiction to entertain the case.  *Id.* at 271.  The court reiterated the pronouncement in *Kokkonen* that ancillary jurisdiction "over a subsequent action involving the settlement" exists if the appropriate language is included in the agreement.  *Id.* at 270 (citing *Kokkonen*, 511 U.S. at 381).  "In such cases, any challenge to the agreement is a challenge to the court's order and the court can exercise ancillary jurisdiction to effectuate its decree."  *Ibid.*  The consent judgment in that case was entered in a dispute arising under federal law, as in this case.  The *Sower* court thus held that the "consent judgment falls squarely within the *Kokkonen* Court's test for ancillary jurisdiction," and that "the

district court could have exercised ancillary jurisdiction over plaintiffs' present complaint seeking to effectuate the terms of the prior consent judgment." *Id.* at 270-71,

Because the City seeks to enforce the terms of the consent judgment in the related case, and it points to specific language in the VEBA Trust that was authorized by that consent judgment, this Court has ancillary jurisdiction to entertain the present action.

III.

The City argues that (1) it will be harmed irreparably if it is forced to make significant annual shortfall payments to the Trust which it cannot afford, (2) once the health plan changes go into effect, there will be no way to recover funds paid out to insurers by the Trust, (3) benefit plan terms are "under the purview" of the City as settlor of the trust, and the Trustees therefor owe a fiduciary duty to the City when carrying out their obligation to manage plan assets, (4) the terms of the Trust Agreement require "mutual consent" by both the City and Trustees before any benefit plan changes may be implemented, (5) the authority of the Trustees is defined wholly by the Trust Agreement, not the Settlement Agreement, because the Trustees were not parties to the settlement, (6) an injunction will protect the City's rights while this controversy is settled, and (7) the public interest favors an injunction which will "ensur[e] [that] a previously struggling municipality on the brink of financial ruin does not return once again to such fiscal straights."

The Board of Trustees respond that (1) the City has not demonstrated irreparable harm, because the actuarial analysis shows that the Trust will remain majorly overfunded even if the single benefit enhancement adopted is continued in perpetuity, (2) in any event the increased premium only was authorized through the end of 2025, not indefinitely, (3) at most the City has asserted that it may be required to make annual shortfall payments, which by definition is a merely economic harm that is reparable by money damages, (4) the City is not likely to succeed on the

merits because its position that the Trust Agreement is controlling is foreclosed by the prior rulings of this Court in the underlying litigation holding to the contrary, (5) the plain language of the Settlement Agreement gives the Trustees full authority and "flexibility" to institute "better" or "comparable" health care benefits, (6) no harm to the plaintiff will result from the benefit plan changes, but significant harm to the defendants will result if they are prevented from carrying out their duties as charged by the Settlement Agreement and Trust Agreement, and (7) the interests of the public would not be served by denying retirees more favorable benefits that the plan readily can afford due to its vastly overfunded status, merely based on the City's unfounded assertion of a veto over any benefit changes and its speculative fear of some future hypothetical harm.

Rule 65 of the Federal Rules of Civil Procedure authorizes the issuance of preliminary injunctions. When a preliminary injunction is requested, the Court weighs the following factors: "(1) whether the movant has a strong likelihood of success on the merits, (2) whether the movant would suffer irreparable injury absent [an injunction], (3) whether granting the [injunction] would cause substantial harm to others, and (4) whether the public interest would be served by granting" injunctive relief. *Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008) (quotation marks omitted). Although courts describe the inquiry as a balancing test, *see Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007), demonstration of a strong likelihood of success generally is a predominating factor, *Wilson v. Williams*, 961 F.3d 829, 844 (6th Cir. 2020); *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 689 (6th Cir. 2014) ("the likelihood of success on the merits often will be the determinative factor.").

Moreover, "[e]ven the strongest showing on the other three factors cannot 'eliminate the irreparable harm requirement.'" *Mitchell v. City of Cincinnati*, No. 21-4061, 2022 WL 4546852, at *2 (6th Cir. Sept. 29, 2022) (quoting *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326-27 (6th Cir.

2019)).  "The irreparable harm prong also requires the injury to be imminent, meaning that the plaintiffs' injury be 'both certain and immediate, not speculative or theoretical.'"  *Ibid.* (quoting *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 391 (6th Cir. 2020)).

The City is not entitled to a preliminary injunction for two reasons: (1) it has failed to demonstrate that it will suffer any certain and imminent irreparable harm, and (2) the City's strained construction of the Trust Agreement language is merely another attempt unilaterally to negate clear and controlling terms of the consent decree to which the City agreed when the class litigation was settled.

First, the City has failed to demonstrate that it will suffer any "irreparable harm" — or, indeed, any harm at all — as a result of the benefit plan change.  The City frets that excessive expenditures on benefit premiums might, at some hypothetical juncture, cause the VEBA Trust to become underfunded, thereby triggering the City's obligation to pay up to $1.5 million annually for every year that the trust funds are actuarially determined to be insufficient to meet future benefit obligations.  However, the City has not rebutted the affidavit testimony presented by Claudia Filler, Chairperson of the VEBA Board of Trustees, who attested that

> [t]he Cost Study prepared by Foster & Foster was calculated on the premise that the VEBA would implement all five enhancements for the life of the Trust. However, that did not occur.  The VEBA contracted for one benefit enhancement at a cost of $387,110 in 2024.  The actual cost of the one implemented benefit enhancement ($387,110) is approximately 25% of the quoted cost for five benefit enhancements.  As such, the actuarial impact calculated by Foster & Foster should be decreased on a proportionate basis, i.e., the funded percentage would reduce from 153% to 148% if this benefit enhancement was implemented for the life of the VEBA Trust."

Claudia Filler aff. ¶¶ 17-18, ECF No. 10-6, PageID.528.  Ms. Filler's unrebutted testimony establishes not only that the Trust is not presently underfunded, but that it is in no danger of becoming underfunded at any time even if the adopted benefit enhancement were continued in perpetuity — and as yet no continuation of the enhancement beyond the end of 2025 has been

authorized.  Moreover, the plain terms of the Settlement Agreement only obligate the City to make up a shortfall "if an actuary determines that [that a contribution is required] to restore the fund to 100% funding through the life of the last beneficiary."  Settlement Agreement ¶ 8.  Nothing in the record suggests that the VEBA Trust is either presently or foreseeably in danger of falling below a 100% funded situation.  To demonstrate irreparable harm, the City must show that its espoused "injury [is] imminent, meaning that the plaintiffs' injury be 'both certain and immediate, not speculative or theoretical.'"  *Mitchell*, 2022 WL 4546852, at *2 (quoting *Sumner Cnty. Sch.*, 942 F.3d at 326-27).  The postulated hazard in this instance is not only speculative and theoretical, it also is devoid of any factual basis, and belied by the available information presently before the Court.

Additionally, it is somewhat nonsensical to call the triggering of the City's potential obligation to make up a funding shortage a "harm."  The City freely negotiated an agreement where it undertook to make such contributions in certain foreseeable circumstances.  The fulfillment of a contractual duty upon specified conditions met does not transform a payment into a "harm" merely because prospectively a party develops a desire to avoid the performance, and the City has cited no legal authority endorsing such a proposition.

Second, the City has failed to show that it is likely to prevail on the merits of its claims, which appear to be no more than an effort by the City to engraft onto the Consent Decree terms that appear nowhere in its plain text.  More specifically, the City would have the Court read the Trust Agreement to afford the City a unilateral veto over all plan alterations, notwithstanding language that expressly charges the VEBA Trustees with the exclusive responsibility to manage the plan assets and assure the continuation of benefits for retirees for the life of the Trust. Paragraph 9 of the Settlement Agreement charges the Trustees expressly with the authority to alter

benefit plan terms: "*Under the New VEBA Plan, the Trustees will have the flexibility to review comparable coverage and make decisions on better, comparable, equivalent and lower cost coverages*." Settlement Agreement ¶ 9 (emphasis added). Nothing in the Settlement Agreement constrains the Trustees' authority in this regard or allows the City any veto over their decisions regarding the determination of ongoing benefit plan terms. The Settlement Agreement does specify a minimum or baseline quantum of benefits that must be continued, but nowhere does it prohibit the Trustees from doing better for retirees if they prudently are able to do so.

Of course, there are limits to what benefit "enhancements" the Trustees may adopt, since they always must abide by the fundamental duty of conserving plan assets to ensure that the Trust will satisfy its benefit obligations throughout the lifetime of all the beneficiaries. *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 572 (1985) ("One of the fundamental common-law duties of a trustee is to preserve and maintain trust assets." (citing Bogert's The Law of Trusts and Trustees § 582 (1985)). But no evidence has been presented here suggesting that the Trustees have in any way compromised that basic duty at present; instead, the record shows that, to the contrary, the plan is now and will remain comfortably over-funded in perpetuity. And even if the City's apocalyptic forecast is taken at face value, ignoring the fact that the Trustees did not adopt all of the cost increases that the City assumes, the worst that has been suggested is that the Trust's overfunded ratio could decrease to 122%. No information has been presented demonstrating that the Trust is in any danger of falling below 100% funding for its obligations in any foreseeable future. The Settlement Agreement plainly obligates the City to make up shortfall only when the Trust's funding level falls below 100% of its projected future liabilities. Recognizing that the City's limited contingent payments might not be sufficient to close a potential funding gap, the Settlement Agreement further authorizes the Trustees to take more

drastic measures such as reducing benefit levels if necessary to eliminate any shortfall not covered by the City's capped contribution of $1.5 million per year.

The City insists that the Settlement Agreement permits the Trustees only to make changes that would result in "lower cost" coverage. But that reading is contrary to the plain meaning of the words "better," "comparable," and "equivalent," which are used in the Settlement Agreement to describe the scope of coverage that the Trustees may procure for retirees. Those words are not defined explicitly in the Settlement Agreement, but under Michigan law, contractual language is given "its plain and ordinary meaning, avoiding technical and constrained constructions." *English v. Blue Cross Blue Shield of Michigan*, 263 Mich. App. 449, 471, 688 N.W.2d 523, 537 (2004). "Absent an ambiguity or internal inconsistency, contractual interpretation begins and ends with the actual words of a written agreement." *Universal Underwriters Ins. Co. v. Kneeland*, 464 Mich. 491, 496, 628 N.W.2d 491, 494 (2001).

Merriam-Webster defines "better" as meaning, among other things, "more attractive, favorable, or commendable." "Comparable" means "similar," "like," and "capable of or suitable for comparison." "Equivalent" means "equal in force, amount, or value." None of those terms are synonymous with "cheaper," and nothing in the Settlement Agreement explicitly mandates that the Trustees must in all events ensure that premiums never increase over some arbitrary historical or nominal set point. Moreover, other terms of the Settlement Agreement expressly contemplate the possibility — and perhaps some likelihood — that benefit premiums could increase significantly; hence the inclusion of a provision requiring the City to make maintenance payments up to a strict cap per annum in the event of a critical funding shortfall.

The City also contends that language in the Trust Agreement constrains the Trustees to making benefit plan changes only with the City's mutual consent. But nothing in the Settlement

Agreement requires the City's consent, and the plain language reposing authority in the Trustees to make decisions and control Trust assets contradicts any conflicting terms on that topic in the subsidiary Trust Agreement.  The Court has been down this road before with the City, when it previously attempted to leverage contradictory terms in its Trust Agreement to override and alter the judicially endorsed terms of the consent decree.  The Court discussed this issue at length in its 2021 opinion granting the plaintiffs' motion to enforce a term of the consent decree requiring the City to fund the Trust fully by a date certain:

> The City is right about one thing — the question presented by this motion is simple, and it is simply resolved by a straightforward reading of the settlement agreement. That agreement required payment of $4.25 million by the City within 90 days after the IRS approved the tax-exempt status of the New VEBA Plan. The approval was issued on August 9, 2020. That started the 90-day clock, requiring the City's payment in full (including the remainder of $176,000) by November 9, 2020.
>
> . . .
>
> The City contends that a subsequent "contract" in the form of the trust declaration superseded and nullified the deadline specified by the parties' settlement . . . . But a "trust" is not a "contract" — even though a trust sometimes may be created by the terms of a related contractual agreement. The settlement agreement here expressly provides — in terms which are plain and undisputed — that it can be modified only by written agreement of "the parties" to the settlement, and with the Court's approval.
>
> . . .
>
> It is a basic principle of trust law that the nature of a trust is not a bilateral exchange of promises between parties, but a unilateral declaration by the settlor that consigns its property to a trustee for the benefit of another.
>
> The City's position in opposing the motion essentially is that by its unilateral endorsement of the "trust agreement" it was empowered, by fiat, to modify according to its whim any terms of the bilateral obligations imposed by the consent judgment. It has not cited any legal authority supporting that position.
>
> . . .
>
> *[T]o the extent that the terms of the settlement dictated requisites for creation of the trust, it is the bilaterally binding promises of the settlement — not the unilateral declaration of trust — that should control and supersede . . . . . Trusts are not*

> *contracts, but their attributes may be defined by the terms of a contract, where, as here, the contract plainly contemplates and expresses intent that a trust be created. . . . Here, the parties' settlement contract plainly contemplated that the benefit trust would be created, and it would be funded by a deposit to be made in full within 90 days after IRS approval of the new tax-exempt entity. Nothing in the settlement agreement empowered the City through subsequent performance of its obligations to arbitrarily extend that deadline merely by expressing a new date in the trust declaration.*

*City of Pontiac Retired Emps. Ass'n v. Schimmel*, No. 12-12830, 2021 WL 11665038, at *3-5

(E.D. Mich. Apr. 6, 2021) (citations omitted; emphasis added).

Moreover, a plain reading of the Trust Agreement shows that its language does not comport

with the City's strained construction.  The operative passage reads as follows:

> *The purpose of this Trust Agreement and the Trust is to provide*, through insurance contracts, contracts with health maintenance organizations, preferred provider organizations, other similar health care provider organizations, or otherwise *for medical benefits for Retirees and their spouses and dependents, pursuant to the terms of the Plan*, and *for such life, sickness, accident or other benefits as defined in Code section 501(c)(9) for Retirees and their spouses and dependents, as the City and the Trustees shall from time to time agree shall be funded through this Trust or as may be required to be funded through this Trust pursuant to the terms of the Settlement Agreement*. Together with the Plan and any other benefit plan funded through this Trust, this Trust shall constitute a VEBA Trust and shall be administered and interpreted so as to comply with the requirements of Code section 501(c)(9). *This Trust is created for the exclusive purpose of providing for the funding of and payment of Retiree Health Benefits through any lawful means in accordance with the Plan and the Settlement Agreement* for the exclusive benefit of Participants and beneficiaries.

Trust Agreement ¶ 2.2, ECF No. 5-1, PageID.345 (emphasis added).  A reasonable reading of that

language shows that the specifications of the Trust purposes are two-fold.  First, the Trust is to

provide "medical benefits for Retirees and their spouses and dependents, pursuant to the terms of

the Plan."  This clause plainly contemplates continuation of retiree healthcare benefits equivalent

to those available at the time of the Settlement, as defined by the exemplar benefit terms outlined

in Paragraph 9 of the Settlement Agreement.  Second, the Trust also contemplates that the Trust

may supply other, unspecified benefits constituting "such life, sickness, accident or other benefits

as defined in Code section 501(c)(9) for Retirees and their spouses and dependents, *as the City and the Trustees shall from time to time agree shall be funded* through this Trust or as may be required to be funded through this Trust pursuant to the terms of the Settlement Agreement." Nothing in the second benefit description clause or elsewhere in the Trust Agreement explicitly limits the Trust to only those benefit plan arrangements that result in no increase to the prevailing premium schedule.  The grammatical structure of the passage also dictates that the phrase "as the City and the Trustees shall from time to time agree" modifies only the last antecedent of that phrase, which is "such life, sickness, accident or other benefits as defined in Code section 501(c)(9) for Retirees and their spouses and dependents," not embracing the preceding clause concerning "medical benefits for Retirees," which are modified by the separate descriptor "pursuant to the terms of the Plan."  "Under the last-antecedent rule, 'a limiting clause or phrase' . . . 'should ordinarily be read as modifying only the noun or phrase that it immediately follows.'"  *Plymouth Cnty. Ret. Ass'n v. ViewRay, Inc.*, No. 21-3863, 2022 WL 3972478, at *5 (6th Cir. Sept. 1, 2022) (quoting *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003)).  "Although this rule 'is not an absolute and can assuredly be overcome by other indicia of meaning,' no such indicia exist here."  *Ibid.*  The natural reading of the passage is that the City must consent to the addition of different, non-medical benefit plans or categories of benefits not explicitly provided for under the prevailing healthcare plan or the Settlement Agreement; not that it must sign off on the minutiae of every plan alteration occasioned by the Trustees' periodic review of the medical benefit contracts.

Other language in the Trust Agreement further belies the City's position that it has a unilateral veto over benefit decisions by the Trustees.  The Trust Agreement broadly and explicitly vests exclusive control over Trust assets with the Trustees, and it expressly authorizes them either to "maintain" existing benefit plans, or to "substitute other comparable or more comprehensive

policies." Trust Agreement ¶¶ 5.1, 5.2(a), PageID.351-52 ("The Trustees *shall have the entire care and custody of all assets of the Trust* . . . . Except as expressly otherwise provide herein, the Trustees *shall have exclusive authority and discretion to manage and control the assets of the Plan held in the Trust Fund* . . . . *The Trustees* shall carry out the purposes of this Trust Agreement, and *may maintain any Retiree Health Benefits now in force and effect* and available to Participants *or may substitute other comparable or more comprehensive policies in lieu thereof*.") (emphasis added). The Trust Agreement even contemplates that the Trustees could decide to discontinue the use of insurance contracts altogether and instead undertake self-funded operations. *Id.* ¶ 5.2(a) ("In addition to, or in lieu of, policies of insurance obtained through commercial or other companies, the Trustees may, consistent with applicable federal and Michigan laws, adopt a self-insured plan."). Those comprehensive terms authorizing the Trustees to take all steps necessary to ensure the continuation of retiree benefits by a variety of means do not include any indication that the Trustees are bound to seek or obtain the City's approval before making any such changes in plan terms — or even before entirely altering the basic fiscal and commercial framework for providing benefits.

Through the consent decree and establishment of the VEBA Trust, the City achieved a massive economic benefit by restructuring its retiree benefit plans in a way that allowed it to set down the yoke of any obligation fully to fund retiree healthcare benefits directly in perpetuity. In so doing, it shifted onto the New VEBA Trust the entire obligation to ensure the continuation of those benefits using the assets bequeathed to the Trust in a lump sum, along with, potentially, tightly constrained make-up payments that might be required on an annual basis in the event of a financial calamity. The City now desires in hindsight to unwind the transfer of control and continue to reap all of the benefits of shirking its funding obligations onto the Trust, while also

- 22 -

claiming the privilege of dictating in minutiae the quality and cost of benefits that the Trustees may procure for retirees with assets of the Trust.  Nothing in the structure of the consent decree or the Trust Agreement supports that duplicitous stance.

In short, the plain language of the agreements on which the City relies, and the Court's prior rulings in the related litigation in which this dispute is rooted, indicate that the City has little likelihood of prevailing on the merits of its claims that the Trustees are obligated to secure the City's blessing before making any changes to retiree health benefit plan terms, including any which foreseeably may increase premium costs.  The plain and controlling language, read reasonably, shows that the sole and exclusive authority to manage Trust assets and determine plan terms is vested in the Trustees — sensibly constrained, as always, by their fundamental obligation to act in the best interests of all the retiree beneficiaries.

IV.

The City has not shown that it will suffer any harm from the benefit plan change, irreparable or otherwise, and its postulated harm is theoretical and not even likely to occur in any event based on the best available information before the Court.  The City also has no likelihood of success on the merits of its claims against the Trustees.

Accordingly, it is **ORDERED** that the motion for preliminary injunction (ECF No. 5) is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  February 29, 2024